# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE CORNUCOPIA INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>AGRICULTURAL MARKETING SERVICE,<br><br>Defendant. | Case No. 1:16-cv-00866-TNM |

## MEMORANDUM OPINION

This is a Freedom of Information Act case, in which the Plaintiff Cornucopia Institute seeks the "entire investigative files for five operations" targeted for investigation by the National Organic Program, a component of the Agricultural Marketing Service. Compl. ¶ 13; Tucker Decl. ¶ 4. I conclude that the Government has fully satisfied its FOIA obligations, with a search reasonably calculated to locate responsive records, and production of nearly all non-exempt records. I will therefore grant the Government's Motion for Summary Judgment as to the lion's share of the records at issue, but grant Cornucopia's cross-motion as to three pages.

## I. Background

In June 2015, Cornucopia Institute sent the Agricultural Marketing Service, an agency within the U.S. Department of Agriculture (USDA), a FOIA request for "the entire investigative files for five operations targeted for enforcement actions by the NOP [National Organic Program] since the beginning of fiscal year 2013." Decl. of Jennifer Tucker Ex. 1, Def.'s Mot. Summ. J., ECF No. 14-2; Compl. ¶ 13. The request listed the operations as "Rosewood Products," "The Sixty," "Serenigy," "Magill Ranch," and "Organic Avenue Juices." *Id*. Cornucopia filed suit in May 2016, having received no documents. Compl. 6.

1

"Between January 7 and May 26, 2016," the Government searched for responsive records. Tucker Decl. ¶ 8. The search focused on records held by the NOP's Compliance and Enforcement Division, since that division "process[es] incoming complaints alleging actionable violations," and investigates those complaints. *Id*. ¶¶ 4, 13. The search involved the NOP's FOIA specialist, specialists from the NOP's Compliance and Enforcement Division "who were in charge of the investigations at issue," and the Compliance and Enforcement Division's director. *Id*. ¶ 9. A complaint's corresponding investigative files are "store[d] and manage[d] . . . on [the NOP's] shared network computer drive," and "each complaint is assigned a unique number when it is received." *Id*. ¶ 10. So the search team "identified the complaints, by number, in an NOP database that tracks complaints, and searched for and retrieved investigative materials stored under those complaint numbers by accessing the program's shared drive." *Id*. "NOP employees also searched hard copy paper investigative records that were maintained in storage cabinets" in the program's Washington, District of Columbia office. This search yielded 881 responsive pages, of which the Government released 420 pages in full, 225 pages in part, and withheld 236 pages in full. *Id*. ¶ 16. The Government invoked FOIA Exemptions 4, 5, 6, 7(C), 7(D), and 7(E) for the records withheld. *Id*.; *see* 5 U.S.C. § 552(b)(4)-(7).

After the parties had filed and briefed two cross-motions for summary judgment, I ordered the Government to "either search for and release to the Plaintiff all non-exempt portions" of nine records or categories of records that the Plaintiff claimed were obvious omitted portions of the five investigative files, or else to "submit a supplemental declaration describing in greater detail the efforts that Defendant has taken with respect to these documents, including why [] additional efforts . . . are not required by law." Order of Jan. 12, 2018, ECF No. 23; *see also* Pl.'s Mem. In Support of Pl.'s Mot. Summ. J. and Opp. to Defs.' Mot. Summ. J. 7-12, ECF No.

23. The Government then undertook an extensive supplemental search for the listed documents, meeting with relevant officials and digging through pertinent hard copy investigative files, shared drive folders, and email records. Decl. of Lynnea Schurkamp ¶¶ 4-16, Notice of Filing Supplemental Decl., ECF No. 25-1 (Schurkamp Decl.). Eventually, the Government located and produced nearly all the documents, except for five that they could not find. Schurkamp Decl. ¶¶ 17-20. Three of the requested documents already been produced. *Id.* ¶ 18. When invited to provide further briefing "in light of factual developments," Minute Order, Mar. 19, 2018, Cornucopia only repeated its objections to the Government's original exemption determinations and renewed its request for *in camera* review, reasoning that "the Court's January 12, 2018, Order ruled on Plaintiff's adequacy of search objections." Pl.'s Further Mem. 2 (Pl.'s Supp. Mem). The Government rested on its prior briefing. Def.'s Response to Pl.'s Supp. Mem 2.

**II. Legal Standards**

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365-66 (D.C. Cir. 2008); *see also* 5 U.S.C. § 552(a)(3)(A) (records sought must be "reasonably describe[d]"). A FOIA defendant is entitled to summary judgment if it proves "beyond material doubt [] that it has conducted a search reasonably calculated to uncover all relevant documents," *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (citation omitted), and that there is no genuine dispute over whether "each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's

inspection requirements." *Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (citation omitted). The "vast majority" of FOIA cases are decided on motions for summary judgment. *See Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Searching for records requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. Dep't of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003). To establish the reasonableness of its search, an agency can submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Agency declarations are given "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (citation omitted). "[S]ummary judgment . . . is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III. Analysis

**A. The Government's Search Efforts Satisfy FOIA's Requirements**

To satisfy FOIA, the Government must conduct a "search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (citation omitted). Here, the Government's search team looked in the pertinent shared

4

electronic drives and in headquarters hard-copy files, and then conducted extensive follow up searches for specific documents. Tucker Decl. 3-4; Schurkamp Decl. ¶¶ 4-16. Cornucopia makes (or has made[1]) three arguments challenging the legal adequacy of the Government's extensive search efforts, but each fail.

First, Cornucopia briefly contends that the Government failed to describe any pre-litigation search, and "did not undertake a search until January 7, 2017." Pl.'s Mem. In Support of Pl.'s Mot. Summ. J. and in Opp. To Def.'s Mot. Summ. J. 6 (Pl.'s Opp.). But even if a pre-litigation search is required—an assumption for which Cornucopia cites no authority—the Government *did* perform such a search. "Between January 7 and May 26, *2016*," the Government searched for responsive records. Tucker Decl. ¶ 8 (emphasis added). Cornucopia seems to have simply misread Ms. Tucker's affidavit on this point.

Second, Cornucopia argues that the Government's original search was legally inadequate. Because the Government "did not disclose the name of the database searched [or] disclose the other databases that were considered but rejected for the search," the Government did not search by using the subjects of the investigations as keywords, and "there is no discussion of a search or regional offices or other [Agricultural Marketing Service] offices," Cornucopia concludes that "it is fair to say that [Ms. Tucker] fails to provide any useful description whatsoever as the agency's search methodology." Pl.'s Opp. 6-7. Not so. We must remember that Cornucopia specifically requested "the entire *investigative files* for five operations targeted for enforcement actions by the NOP." Tucker Decl. Ex. 1 (emphasis added). The Government knows that it "stores . . .

---

[1] One possible interpretation of Cornucopia's supplemental brief is that given the Government's recent efforts, Cornucopia is now satisfied that the search was legally adequate. Pl.'s Supp. Mem. 2 (declining to discuss the search, since "the Court's January 12, 2018, Order ruled on Plaintiff's adequacy of search objections.").

5

investigative and other files . . . on [NOP's] shared network computer drive," and "hard copy paper investigative records . . . in storage cabinets within NOP office space in Washington, [District of Columbia]." Tucker Decl. ¶¶ 10-11. By searching these locations, the Government conducted a search "reasonably calculated to uncover" the investigative files at issue. *See Weisberg*, 745 F.2d at 1485. Cornucopia offers only speculation that the Government would have been better served using search terms (even though investigative files are organized by complaint number), or looking in other databases or offices, and speculation cannot rebut the presumption of good faith given to agency declarations. *SafeCard Servs. Inc.*, 926 F.2d at 1201.

Finally and most substantially, Cornucopia contends that the Government has failed "to follow-up on clear leads indicating the existence of additional agency records responsive to Plaintiff's FOIA request." Pl.'s Opp. 7. Cornucopia identified many documents that certainly seem like part of pertinent investigative files, including the complaint that kicked off the Magill Ranch investigation, and "exhibits" mentioned by various investigation summaries that the Government produced. *Id*. 10-12. And the Government does have an obligation to "follow through on obvious leads to discover requested documents.*" Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). But the follow-up search that the Government has conducted here satisfies this standard, and indeed appears to have been exhaustive and successful. Schurkamp Decl. ¶¶ 4-20. Cornucopia seems to agree, above n. 1, and I conclude that the Government has discharged any duty to track down obvious leads.

### B. The Government Largely Applied FOIA's Exemptions Correctly

FOIA "allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir.

2010) (citations omitted).  Plaintiff only contests records withheld under Exemptions 4 and 5, and I conclude that the Government properly applied those exemptions except as to three pages.

### 1. Under Exemption 4, Cornucopia Is Entitled to One Disputed Page

Exemption 4 applies to "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Cornucopia contends that (1) the Government has withheld a page of product labels that cannot be considered confidential because they have "already [been] disclosed to the public," Pl.'s Opp. 14, (2) the Government has withheld entire organic handling plans when it could have produced some details, *id*. 18-21, and (3) the Government has redacted the phrase "Aloha Medicinals" only occasionally, thus waiving the privilege for that phrase, *id*. 17-18. Only the first of these arguments holds water.

The Government characterizes a page of product labels they have withheld as "unpublished drafts of proposed product labels" sent to Organic Avenue's certifying agent "as a requirement of continued certification." Vaughn Index 1 (citing bates-stamped page 6). But Cornucopia persuasively argues that the labels are not "unpublished," because the redacted page is the enclosure to a "Notice to Cease and Desist." Pl.'s Reply 10 (citing Supplemental Fantle Decl., Exhibit C at 1-3 (bates stamped 4-6)). Reading the Notice to Cease and Desist confirms the argument: Organic Avenue is told to stop using *current* product labels that used the term "Organic Avenue," since they have no certification from the NOP. The Notice references an "Enclosure," and the Government has redacted the following page. Vaughn Index 1. The context makes it clear that page 6 constitutes the referenced "Enclosure," and that the product labels therein were published without certification, rather sent to Organic Avenue's certifying agent "as a requirement of continued certification." *Cf.* Vaughn Index 1 *with* Supp. Fantle

Decl., Exhibit C at 1-3 (bates stamped 4-6). In short, the context proves that the redacted product labels were publicly posted, not unpublished.[2]

Since the labels were being publicly displayed, and thus the subject of the cease and desist notice, the Government cannot invoke Exemption 4's protection for "confidential" information. Under D.C. Circuit precedent, the test for whether material is "confidential" depends on whether the information was disclosed to the Government on a voluntary or mandatory basis. *Ctr. for Auto Safety*, 244 F.3d 144, 147-48 (D.C. Cir. 2001). If voluntary, the information is "confidential" for Exemption 4 purposes "if it is of a kind that [the provider] would customarily not [] releas[e] to the public." *Id*. at 147. But if mandatory, the information is confidential "if disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Id*. at 148. The Government seems to have obtained this information voluntarily, using product labels that were being customarily (and illegally) displayed to the public. The labels were therefore not confidential.[3] Since the Government has failed to establish that Exemption 4 applies, FOIA requires disclosure.

---

[2] The Government's only answer to this contextual argument was that the "Notice to Cease and Desist . . . as described by Plaintiff . . . is nowhere to be found in the record." Def.'s Reply at 16. Although the Plaintiff then filed the relevant pages, Supp. Fantle Decl., Exhibit C at 1-3 (bates stamped 4-6), and the Government could have responded in later briefing, it never did.

I do not rely on Cornucopia's claim that regulations requiring public product labels are relevant here, and so I do not address the Government's rebuttal argument.

[3] Even if the Government obtained the labels on a mandatory basis, they are still not confidential. The Vaughn Index asserts that unpublished labels "can be used by the company's competitors in the organic industry . . . to duplicate formulations." Tucker Decl., ECF No. 14-4 at 1 of 67 (bates stamped 00006). But if the labels are already public, further disclosure after a FOIA request does not work "substantial harm to [a] competitive position." *Ctr. for Auto Safety*, 244 F.3d at 148.

The Government questions "why Plaintiff would seek items in a FOIA request it believes to be already obtainable in the public domain," and suggests that "the party favoring disclosure has the burden of demonstrating that the information sought is *identical* to information already publicly available." *Id.* (quoting *Ctr. for Auto Safety*, 244 F.3d at 151) (emphasis original). But "[t]he 'identical information' basis for disclosure is . . . entirely distinct from the 'customary disclosure' standard." *Ctr. for Auto Safety*, 244 F.3d at 151. Under the former, Cornucopia would have the burden, while under customary disclosure analysis (and any Exemption 4 claim), it is the Government that bears the burden. *Id.* The Government invoked Exemption 4 for these product labels, and the Government has failed to carry its burden of showing that they were confidential.

Cornucopia next claims that the Government's decision to withhold entire organic operation plans for several businesses under investigation is overbroad, contending that at least *some* information should have been provided. *See* Pl.'s Opp. 16. Yet Cornucopia nowhere identifies what specific information it wants (and neither does the underlying FOIA request), despite the Government's highly detailed description of what the plans contain.[4] And nowhere does Cornucopia rebut the Government's claim that "The organic processor plan contains critical information about internal business operations. Competitors can use this information to identify and exploit weaknesses, or duplicate processes without investing resources." Tucker Decl., ECF. No. 14-4 at 8 (Vaughn Index). The case on which Cornucopia purports to rely does not apply. It cites *Animal Legal Def. Fund v. United States Food & Drug Admin.*, 2013 WL 4511936, at *9

---

[4] *See* Tucker Decl. ¶ 23e ("These records are detailed plans outlining internal business and operating procedures for organic operations. These plans may include . . . recipe and ingredient lists; disclosure statements; supplier identifications; production steps . . . details on equipment and transportation; and information relating to farm location and field cover.").

(N.D. Cal. Aug. 23, 2013) for the proposition that "disclosure of limited, non-exempt information within a [larger] document" is appropriate, because that disclosure would not work "substantial competitive harm." Pl.'s Opp. 18-20. Not only is that case in another jurisdiction, but the Ninth Circuit has since reversed and remanded it, destroying any persuasive value. *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 839 F.3d 750 (9th Cir. 2016). In any event, I am convinced that the Government has carried its burden of showing that organic production plans are commercial, obtained from investigated businesses, and confidential, and thus subject to Exemption 4.

Third, Cornucopia argues that the Government "inconsistently applied (b)(4) exemptions to [the phrase] 'Aloha Medicinals,'" Pl.'s Reply 13, and that since Cornucopia has since posted the revealed uses of the phrase on a permanent public website, the phrase now fits the "public-domain doctrine," under which "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). But as the Government points out, this contention rests on a false inference. Just because "Aloha Medicinals" preceded "/Serenigy" in a disclosed email subject line, it is not true that every redaction of a phrase before "/Serenigy" must represent a deletion of "Aloha Medicinals." *See* Def.'s Opp. To P.'s Mot. Summ. J. and Reply 17 (Def.'s Reply). Emails regarding Serenigy may well mention other commercially-relevant products or phrases. In other words, Cornucopia has not shown that the hidden phrase they want to see has already been disclosed, and so fails to rebut the Government's contention that the information is commercial and confidential. *See Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992) (holding that under the public domain doctrine, "the requester [must] point to "specific" information identical to that being withheld.")

10

## 2. Under Exemption 5, Cornucopia Is Entitled to Two Disputed Pages

"Exemption 5 excludes from mandatory release 'interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.'" *Morley*, 508 F.3d at 1126 (quoting 5 U.S.C. § 552(b)(5)). The exemption incorporates several evidentiary privileges, including "materials which would be protected under the attorney-client privilege . . . [and] the executive 'deliberative process' privilege." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980) (citations omitted). The Government has invoked Exemption 5 to protect several categories of records, including "draft notices" of civil penalties and proposed settlement, "draft . . . recommendations on whether to uphold adverse actions," draft requests to investigate, internal communications about investigations, proposed penalties, and settlements, and "communications . . . between NOP and the USDA, Office of General Counsel regarding the investigations." Tucker Decl. 8. Cornucopia's challenges to these withholdings fail except as to two pages.

Cornucopia begins with vague allegations that the Government has not identified deliberative records "clearly" enough to establish that all fall within the deliberative process privilege, Pl.'s Opp. 22, and that the Government "fail[s] to identify any of the specific people [relating] to the withheld [attorney-client privilege] records as an attorney." *Id*. at 23. But vague claims do not rebut the presumption of good faith afforded the Government's affidavits, particularly when an affidavit and corresponding 67-page *Vaughn* index provide the reasonable level of detail seen here. Tucker Decl. 8; *see, e.g.* Vaughn Index 4-5 (invoking Exemption 5).

Cornucopia then takes a more productive tack, and challenges specific withholdings. It first argues that in describing a "Memorandum report from [an] NOP manager to agency Office of General Counsel attorneys" about the "SereniGy" investigation, Vaughn Index 37, the

11

Government "fails to identify specific people . . . as an attorney," "does not specify why the communication is entitled to 'confidential' treatment," and gives a "wholly conclusory" basis for invoking Exemption 5. Pl.'s Opp. 23. But these accusations are off-base. After describing the information withheld as a "[m]anager's policy and enforcement action recommendations and questions to attorneys," Vaughn Index 37, Ms. Tucker gives a thorough justification:

> Deliberative process privilege – pre-decisional and deliberative.
>
> The draft document contains the author's recommendations about prospective enforcement action options. The document was drafted expressly for use by agency Office of General Counsel staff during attorney-client communications with NOP staff. The record is pre-decisional because it was developed before the agency took any official action regarding the enforcement action at issue.
>
> Attorney-Client Privilege: The withheld portions contain information prepared by [Agricultural Marketing Service] and provided to the USDA, Office of the General Counsel, for the purpose of soliciting legal advice about the enforcement action at issue.

*Id*. I am satisfied that these enforcement questions posed by the NOP to "attorneys" in the "Office of General Counsel" are attorney-client privileged, and subject to the deliberative process privilege. Ms. Tucker's description easily satisfies the legal requirement that "affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project*, 656 F.2d at 738.

Next, Cornucopia argues that the Government has improperly redacted parts of four "notices of non-compliance." Pl.'s Opp. 23 (citing Exhibit A to Fantle Decl. in support of Pl.'s Opp. at 62-63, 65, 72-73, 74-75 (referencing records that are bates stamped 84-85, 622, 290-291, and 296-297)). The Government quickly explained that "Each and every notice of

noncompliance cited by Plaintiff was excepted under either Exception 4 or Exception 6 . . . [and] [n]one of them were excepted under Exception 5." Def.'s Reply 22. Cornucopia had nothing to say in response. Pl.'s Reply 13-14 (never mentioning Exemption 5). Reviewing Cornucopia's cited pages largely confirms the Government's point: only two of the relevant pages are redacted under Exemption 5 at all, Exhibit A to Fantle Decl. at 62-63 (bates stamped 84-85), and those pages are not part of any notice of noncompliance.[5] But review also reveals that the Government has provided no description at all for those two pages, and appears to have simply invoked Exemption 5 without explaining why in either the Vaughn Index or the Tucker Declaration.[6]

It is the Government's "burden . . . to establish their right to withhold information from the public and they must supply the courts with sufficient information to allow us to make a reasoned determination that they were correct." *Coastal States Gas Corp.*, 617 F.2d at 861. "[C]onclusory assertions of privilege will not suffice to carry the Government's burden of proof

---

[5] The two pages are fully redacted under Exemption 5, except for their respective titles: "Request for Hearing" and "Waiver of Hearing." *See* https://www.cornucopia.org/FOIA-reading-room/2015%20NOP%20enforcement%20responsive%20records.pdf at bates stamped pp. 84-85 (last visited May 14, 2018) (containing the full 881 pages of responsive records in redacted form) (Full Record). There is a Notice of Noncompliance and Proposed Revocation that immediately precedes the pages, but the "Hearing" documents are unrelated—the notice is numbered "Page 1 of 2" and "Page 2 of 2," and never mentions a hearing, any attachments, or any exhibits. *Id.* at 82-83. The Vaughn index mistakenly says that the "Notice of Noncompliance" is on bates stamped pages 84-85, Vaughn Index 7, but Ms. Tucker is actually referring to pages 82-83. The index describes a two-page Notice for which the Government invokes only Exemption 4 (not Exemption 5), *id.*, a description that precisely matches bates stamped pages 82-83. *Cf.* Full Record at 81-85 *with* Vaughn Index 7. In short, both parties have erroneously characterized the pages bates stamped 84-85, but those pages are not a Notice of Noncompliance, or any part thereof.

[6] Because the Notice of Noncompliance is on pages 82-83, above n. 5, the "Request for Hearing" and "Waiver of Hearing" on pages 84-84 remain completely un-described. The pages simply bear the designation "(b)(5)" on a black square below each title, and I have searched in vain through the Vaughn Index and the Tucker Declaration for another reference to either a "hearing" or the pertinent pages.

in defending FOIA cases." *Id*. If the Government fails to carry this burden, then a court may order release of the documents at issue. *Id*. at 870 (holding that "the defendant . . . has failed to carry its burden of establishing that the documents involved in this appeal were properly withheld . . . [and] [t]he decision of the district court ordering release of the documents is therefore affirmed.") "The limited exemptions provided in the Act, are to be 'construed narrowly, in such a way as to provide the maximum access consonant with the overall purpose of the Act.'" *Yeager v. Drug Enf't Admin*., 678 F.2d 315, 320 (D.C. Cir. 1982). Because the Government has offered only the most conclusory of justifications here—an unexplained "(b)(5)" claim without reference to even a specific privilege—the Plaintiff has established that no genuine dispute on an issue of material fact precludes disclosure of this document.

Finally, Cornucopia argues that the Government improperly withheld portions of "proposed settlement agreements" under the deliberative process privilege, since any final agreements or communications with external, non-government actors would not be privileged. Pl.'s Opp. 24. But as the Government has explained in detail, each of these draft settlement agreements were "created within [the Agricultural Marketing Service]," and are "the author's recommendations about what the final version should state . . . created before the agency made any decision regarding the settlement." *E.g.* Vaugh Index 17; *see also* Def.'s Reply 23 (citing the remaining entries). This amply satisfied the requirements for the deliberative process privilege.

### C. *In Camera* Review is Not Warranted

As part of its required *de novo* review, a court "*may* examine the contents of . . . agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B) (emphasis added). "[D]istrict courts have

14

substantial discretion" in deciding whether to review documents *in camera*, *Ctr. for Auto Safety*, 731 F.2d at 21, and "[t]he ultimate criterion is simply . . . [w]hether the district judge believes that in camera inspection is needed in order to make a responsible *de novo* determination on the claims of exemption." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978).

Cornucopia seeks *in camera* review of two documents: the Organic Avenue product labels disputed under Exemption 4, and an "Organic Processor Handling Plan" withheld in full, also under Exemption 4. Pl.'s Opp. 24. Given the strong evidence that Exemption 4 does not apply to the Organic Avenue product labels, and my ruling for Cornucopia on that page, I conclude that there is no need for *in camera* review.

As for the "Organic Processor Handling Plan," Cornucopia offers nothing but speculation for the proposition that FOIA's reasonably segregability requirement has been violated. The mere possibility of error does not warrant *in camera* review. *Ctr. for Auto Safety*, 731 F.2d at 22.

## IV. Conclusion

For these reasons, Defendant's Motion for Summary Judgment will be granted as to all but three pages. As to those three pages, I will grant Plaintiff's Cross-Motion for Summary Judgment. A separate order will issue.

Dated: May 14, 2018

TREVOR N. MCFADDEN
United States District Judge